**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Alfonso Labrada GUROLLA, Defendant–Appellant.**

**United States of America, Plaintiff–Appellee,**

**v.**

**Jose Reyes Ortega–Gonzalez, Defendant–Appellant.**

**United States of America, Plaintiff–Appellee,**

**v.**

**Manuel Barraza Leon, Defendant– Appellant.**

Nos. 99–50657, 00–50188, 01–50579.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 2003.*

Filed June 23, 2003.

---

* The panel unanimously finds Barraza's case suitable for decision with out oral argument.

*See* Fed. R.App. P. 34(a)(2).

Charles Pereyra–Suarez, Los Angeles, CA, for defendant-appellant Labrada Gurolla.

Gail Ivens, Glendale, CA, for defendant-appellant Ortega–Gonzalez.

Phillip A. Treviño, San Francisco, CA, for defendant-appellant Barraza Leon.

Julie J. Shemitz, Assistant United States Attorney, Narcotics Section, Los Angeles, CA, for the plaintiff-appellee.

Before BROWNING, PREGERSON, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge.

Appellants Alfonso Labráda Gurolla ("Labrada"), Jose Reyes Ortega–Gonzalez ("Ortega"), and Manuel Barraza Leon ("Barraza") are three Mexican bankers who were arrested in the largest money laundering sting in United States history: Operation Checkmark. Appellants were tried and convicted of money laundering and related offenses and sentenced, respectively, to 87, 121, and 78 months in prison. Appellants raise numerous arguments on appeal, the most significant of which is Ortega's contention that the district court erred by refusing to allow him to present an entrapment defense to the jury. Resolving this question requires that we address an interesting preliminary inquiry: whether, on appeal, Ortega's sworn declarations, which were presented to the district court *ex parte* and under seal, in opposition to the government's pretrial motion to preclude him from raising an entrapment defense, and which remain under seal to this day, must be disclosed to the government so that it can respond fully to the arguments presented in his opening brief. We hold that Ortega's sealed declarations are protected from disclosure on appeal. On the merits, we hold that the district court erred when it refused to allow Ortega to present a defense of entrapment. Accordingly, we reverse Ortega's conviction and remand for a new trial. With regard to the other Appellants, we affirm, except for Barraza's sentence. We reject the joint claims of outrageous government conduct and cumulative evidentiary error, Labrada's assertion that he should have received an entrapment instruction, and all the contentions relating to the assistance of counsel; however, we remand for resentencing in Barraza's case because both parties agree that his sentence was based on a miscalculation of the amount of loss.

## I. FACTUAL AND PROCEDURAL BACKGROUND

From November 1995 to May 1998, the United States Customs Service ran Operation Casablanca, an international venture that has constituted the largest undercover drug investigation in United States history. This appeal stems from a subset of that investigation, Operation Checkmark, itself the largest money laundering sting ever conducted by the U.S. government. Operation Checkmark targeted Mexican banks, which, the Customs Service believed, used bank drafts to launder money for the Cali and Juarez drug cartels. The investigation ultimately led to the indictment of 40 international defendants, including three corporate defendants.

Prior to trial, defendants Katy Kissel Belfer ("Kissel"), Bancomer, and Banco Serfin filed separate motions to dismiss the indictment for outrageous government conduct. Appellants joined in those motions.[1] The district court rejected the claims in a lengthy written opinion. After the motions were denied, all except six defendants entered guilty pleas.

Also prior to trial, the government filed a motion in limine to prohibit defense counsel from discussing entrapment in their opening statements. Only Kissel initially opposed the motion. By minute order, the district court granted the government's motion in part and prohibited all defendants, with the exception of Kissel, from presenting evidence in support of an entrapment defense. The district court's order on entrapment was broader than the government's motion: Although the government sought only to bar defense counsel from explaining the legal theory of entrapment in their opening statements, the district court ruled that no defendant, other than Kissel, could argue entrapment during his opening statement or present affirmative evidence of entrapment during his case-in-chief.[2]

Ortega requested reconsideration of this order and, in support of his request, filed *ex parte* and under seal a sworn declaration explaining the factual basis for his claims. The district court reviewed the declaration and issued a minute order denying him the right to present an entrapment defense. At a subsequent hearing, he again asked the district court to reconsider its ruling. The district court stated that it would allow him to submit a more detailed offer of proof on entrapment, and several days later, he filed a second declaration. The district court reviewed this filing also but ultimately held in a sealed, written order that Ortega did not make a prima facie showing of entrapment. Because the two declarations and the order were filed *ex parte* and under seal, and because they remain sealed to this day, the government has never seen them. As a result of the district court's ruling, Ortega did not testify at trial.

According to the evidence presented at trial, Operation Checkmark's money laundering scheme worked as follows: The Customs Service established several undercover bank accounts, mostly at the Bank of America in the United States. Meanwhile, the Mexican bankers established "nominee" or "straw" bank accounts at their banks in Mexico.[3] When the Cus-

---

1. All three appellants joined in Kissel's motion, but only Ortega and Barraza joined in the banks' motions.

2. The government submitted a similar motion in limine with respect to duress. The district court granted this motion with respect to all defendants, including Kissel. On appeal,

Ortega contests the district court's ruling on duress. However, because we reverse on entrapment, we do not reach this issue.

3. A "nominee" is a person who opens a bank account in his name but assigns to someone else the exclusive authority to deposit and

toms Service wanted to launder money, it wire-transferred the money from its own account to the Mexican bank's correspondent account at Bank of America in Los Angeles.[4] From the correspondent account, the funds would be wired to one of the straw accounts. The bankers would then issue bank drafts, which they would express mail to undercover agents in the United States.[5]

A central figure in the investigation was Fred Mendoza, a.k.a. Javier Ramirez, a confidential informant for the Customs Service who pretended to be an experienced money launderer. The evidence showed that he was responsible for getting the sting up and running, which he accomplished during a key meeting with Victor Alcala Navarro, a low-level money launderer for the Cali cartel. Mendoza brought Navarro to the warehouse for Emerald Empire Corp., a fictitious business set up by Mendoza as a front for a money laundering operation. The warehouse was actually rented by the Customs Service, and it featured a conference room rigged with secret videotape equipment that recorded Mendoza's conversations with potential money launderers. There, Mendoza suggested, and Navarro agreed, that they would launder money together for the Cali cartel: Mendoza would provide the money, and Navarro would provide the bankers.

Soon afterwards, Navarro arranged a meeting between Mendoza and Ortega, who was then the Banking Operations Director at the Bancomer branch in Tepatitlan. The meeting was held at Emerald Empire and was secretly videotaped.[6] At the meeting, Ortega agreed to launder money, and he helped Mendoza to perfect his money laundering plan. In September 1996, Mendoza flew to Tepatitlan with $10,000 in cash, which he used to open two accounts. Shortly afterwards, Mendoza opened three more accounts through an intermediary at Bancomer's Tijuana branch. Throughout the course of the investigation, Ortega laundered money for Mendoza, sometimes offering advice as to money-laundering strategy, and at one point changing jobs to work at a different bank. Ultimately, the evidence showed that Ortega laundered over $18 million for Mendoza and received $30,000 in commissions for his participation.

Meanwhile, Navarro continued to enroll bankers in the criminal conspiracy. He grew so busy that he had to hire someone to help him manage the operation. That person conscripted a lawyer who sometimes worked for Bancomer; the lawyer brought Labrada into the conspiracy; and Labrada recruited his friend, Barraza. Labrada and Barraza each performed only two money-laundering transactions. At trial, they testified that they thought Mendoza ran a legitimate business.

During the jury instruction conference, which occurred at the end of the trial, counsel for Ortega and Labrada requested that the district court instruct the jury on entrapment. Both argued that they were entitled to an entrapment instruction based on the evidence that had been presented at the trial. However, the district court denied the motions and reiterated

---

withdraw funds. The nominee usually has no legal control over account transactions.

**4.** A "correspondent account" is an account that a foreign bank keeps at a U.S. bank to facilitate wire transfers between the foreign bank and U.S. banks.

**5.** Bank drafts are checks drawn on correspondent accounts, rather than an individual's account. Once issued, they are not traceable to a particular individual.

**6.** The videotapes were entered into evidence.

that only Kissel would be allowed to argue entrapment to the jury.

Kissel testified in her own behalf, argued entrapment, and was acquitted. Also acquitted were the two other defendants, whose primary connection to the money laundering scheme was that they had attended a dinner party with some of the money launderers. Ortega, Labrada, and Barraza were convicted and sentenced respectively to 121, 87, and 78 months in prison. The government agrees that Barraza's case should be remanded for resentencing because the amount of loss was incorrectly calculated. The cases were consolidated for purposes of appeal.

## II. DISCUSSION

### A. Outrageous Government Conduct

■ Appellants contend that their indictments should be dismissed because the government's conduct was so outrageous that it violated the Due Process Clause of the Fifth Amendment. We review this claim de novo. *United States v. Cuellar*, 96 F.3d 1179, 1182 (9th Cir.1996). However, we view the evidence in the light most favorable to the government and we accept the district court's factual findings unless they are clearly erroneous. *Id.; see also United States v. Emmert*, 829 F.2d 805, 810–11 (9th Cir.1987).

■ The defense of outrageous government conduct is limited to extreme cases in which the government's conduct violates fundamental fairness and is "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (quotations omitted). This standard is met when the government "engineer[s] and direct[s] a criminal enterprise from start to finish." *United States v. So*, 755 F.2d 1350, 1353

(9th Cir.1985); *Greene v. United States*, 454 F.2d 783 (9th Cir.1971) (finding outrageous government conduct where the government agent contacted the defendant, urged him to run an illegal still, provided materials for the still, employed veiled threats to convince him keep the still running, and was the sole customer). The standard is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture. *So*, 755 F.2d at 1353 (citations omitted). In this case, the government knew before it launched the sting investigation that Mexican banks were involved in money laundering, although it was not aware of the specific identity of all the participants. Because the government did not initiate the criminal activity, but rather sought to crack an ongoing operation, its conduct was not outrageous and did not violate due process.

■ Appellants argue that even if the government's conduct did not rise to the level of a due process violation, the district court erred in failing to exercise its discretion to dismiss the indictment. We review this claim for abuse of discretion. *United States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir.1991). As a general rule, "[c]ourts do not have the authority to supervise out-of-court executive procedure in the absence of a constitutional or statutory violation." *Id.* at 1092. Here, although Appellants do not allege any constitutional or statutory violations, other than outrageous government conduct, they do allege a treaty violation. However, Appellants lack standing to enforce the treaty. *United States v. Duque*, 62 F.3d 1146, 1151 (9th Cir.1995). In any event, the evidence in the record does not establish that the government's activities in Mexico were other

than legitimate and minimal, or that dismissal of the indictment is otherwise justified. Accordingly, the district court did not abuse its discretion when it refused to exercise its supervisory power to dismiss the indictment.

■ Next, we address an issue that arose for the first time at oral argument. There, it came to our attention that the attorneys of the United States Department of Justice, Criminal Division, Narcotic and Dangerous Drug Section, Drug Intelligence Unit ("Drug Intelligence Unit"), had filed an *ex parte, in camera* motion in the district court to protect certain classified materials from disclosure under Rule 16 of the Federal Rules of Criminal Procedure and Section 4 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. § 3 (1994), and that on that same day the district judge granted the motion. Neither defense counsel nor the Assistant United States Attorney was given notice of the filing at the time that it was made, or of the district court order. Nor were the motion or the order entered on the district court record. We have reviewed the motion and order *in camera*, and it is clear that the classified items would not have been "relevant and helpful to the defense." *United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1261 (9th Cir.1998). Accordingly, they were not material, and the government had no obligation to disclose them.

*Id.* To the extent that there may have been failures to follow the statutorily mandated procedures with respect to the motion and ruling, the errors were, in the circumstances of this case, non-prejudicial.[7]

### B. Entrapment

■ The affirmative defense of entrapment contains two elements: government inducement of the crime and absence of predisposition on the part of the defendant. *United States v. Poehlman*, 217 F.3d 692, 693 (9th Cir.2000) (inner quotations omitted). "Only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir.1993)(quotations omitted). In this case, we consider whether Ortega should have been allowed to offer evidence in support of an entrapment defense, and whether the evidence actually introduced entitled Labrada to an entrapment instruction.

### 1. Ortega

#### (a) Sealed Material

■ The district court's sealed order precluding Ortega from offering an entrapment defense was entered after it considered Ortega's sealed declarations.[8] After

---

7. We note that it is essential that the prosecution and the defense, and especially the latter, be advised that the district court has made a ruling protecting classified information from disclosure, so that the order may be challenged on appeal. Such is clearly a requirement of Section 4 of CIPA. *See* 18 U.S.C. app. § 3, 4 (1994) ("If the [district] court enters an order granting relief following such an *ex parte* showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal."). The statutory procedures are binding on the Department of Justice and the district court.

8. A district court may require a defendant to submit a pretrial offer of proof on an entrapment defense; if the defendant fails to make a prima facie showing, the district court may preclude him from presenting the defense at trial. *Cf. United States v. Arellano–Rivera*, 244 F.3d 1119, 1125–26. Here, Ortega was required to submit a pretrial offer of proof on his entrapment defense. We review *de novo* a district court's decision to preclude a defense. *United States v. Moreno*, 102 F.3d 994, 997–98 (9th Cir.1996).

Ortega filed his opening brief on appeal, the government filed a motion requesting that it be furnished with a copy of Ortega's declarations and the district court's order. The government stated that it "d[id] not contest the district court's authority to seal the declarations at issue, but submits that it is entitled to view the documents in order to respond to the claims defendant raises on appeal." Ortega opposed the motion, the appellate commissioner referred it to us, and we denied it several weeks prior to oral argument. Because the government's motion raises a question of first impression, we now explain the reasons for our order.

It is clear that the district court had the authority to accept Ortega's submissions under seal. *See United States v. Hickey*, 185 F.3d 1064 (9th Cir.1999) (recognizing authority of district court to accept financial affidavits under seal); *United States v. Hardwell*, 80 F.3d 1471, 1483–84 (10th Cir. 1996) (same). The government concedes as much in its motion. In the district court, the government neither objected to the sealing of the declarations and order, nor did it argue that it needed to see Ortega's declarations in order to respond fully to his arguments on entrapment. To the contrary, the government was content to allow the district court to make its decision on the basis of the sealed documents alone.

Now, the government asserts that it needs to see the sealed documents in order to respond fully to the arguments Ortega raises in his opening brief. We agree that lack of access to the sealed documents hampers the government's ability to respond to Ortega's arguments. However, the government overlooks the fact that it was at an even greater disadvantage in the district court,[9] and that the issue on appeal is whether the district court's ruling was erroneous. All that has changed is that, following the district court's exclusion of Ortega's defense and his resultant failure to testify, Ortega was convicted. In the district court, the government was not permitted to respond to Ortega's evidence, and it concedes that this decision by the district court was proper. Thus, the government has no absolute right, as it asserts, to examine the evidence that Ortega marshaled in support of his request to be permitted to present an entrapment defense. We reject as well the government's argument that by appealing the district court's decision excluding his entrapment defense, Ortega waived his ability to protect his proposed testimony from disclosure.[10] Defendants do not waive their substantive rights by raising arguments on appeal.

When an appellate court reviews documents that were filed on an *ex parte* basis and *properly* sealed, including written orders by the district court, it must honor

---

**9.** The government is in a better position on appeal because it is able to respond to the facts and arguments asserted in the defendant's opening brief. In the district court, the government had no information regarding the defense's arguments. Here, at least, it has Ortega's brief.

**10.** Ortega could have asked us for permission to file a separate brief under seal that dealt with the issue of his right to pursue an entrapment defense. That would have been the more appropriate course to take, considering that he intended to challenge a sealed order

on that question in his brief. Instead, however, Ortega chose to file an unsealed brief and rely on some of the contentions asserted in the sealed proceedings. The government, however, does not contend that by revealing some of the content of his sealed testimony, he waived his right to protect the remaining testimony, or even that he waived his right to keep sealed the testimony discussed in the brief. Accordingly, we consider only the one waiver issue raised by the government: whether the appeal itself constitutes a waiver.

the district court's seal and not disclose the contents of those documents to the parties or the public. Of course, the government is free to argue that the district court erred when it sealed the documents, and the press and other interested third parties retain their right to intervene and request that particular documents be unsealed. *See, e.g., Seattle Times Co. v. United States Dist. Ct.,* 845 F.2d 1513 (9th Cir.1988). In this case, however, no party has challenged the district court's decision to seal the documents. The government's only argument is that if the government reviewed the sealed material, this would facilitate its ability to defend the district court's order. The defendant responds that the unsealing of the documents would prejudice him in a retrial.[11] We simply fail to see any reason why we should allow the government to see a document that it concedes was *properly* sealed by the district court. On appeal, as in the district court,

the government has the right to argue for exclusion of the entrapment defense but, as in the district court, the only evidence it will ordinarily be able to refer to is evidence that it may have filed in support of its own motion to exclude and whatever other unsealed evidence may already be before the court. Accordingly, we hold that the government is not entitled to view and respond to the sealed declarations and order. To the extent that the government was enabled to discern the factual basis of Ortega's opposition to its motion from the arguments Ortega advanced in its brief on appeal and respond to them directly, it has received a fortuitous benefit to which it was not entitled under the law.

### (b) Merits of Defense

■ We turn now to the merits of the entrapment defense question. Ortega's brief on appeal makes the following argu-

---

11. In fact, such a ruling unsealing these documents would impose a double burden on a defendant should the appellate court hold that the district court erred in excluding the entrapment defense. First, the defendant would have to undergo a second trial. That is the usual burden that a defendant must accept as the price of prevailing on appeal. Second, however, he would have to disclose information regarding his defense that the government concedes he would not have been required to disclose were the trial his first. This would be a new and additional burden, one that placed Ortega in a substantially worse position after prevailing on appeal than he would have been in had the district court ruled correctly in the first instance.

We note as well that the substance of a criminal defendant's proposed testimony about the historical facts of the crime may be protected by the Fifth Amendment's testimonial privilege, *cf. Williams v. Florida,* 399 U.S. 78, 86 n. 17, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and that a criminal defendant's right to present an entrapment defense may be protected by the Sixth Amendment. *Cf. Gilmore v. Taylor,* 508 U.S. 333, 343–44, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). If we were to find for the government here, we

would in effect be adopting a rule that would allow a district court to prohibit a criminal defendant from presenting an entrapment defense unless he agreed to disclose the substance of his testimony to the prosecution prior to trial. Such a rule might be unconstitutional, because it might have the effect of forcing a criminal defendant to choose between his Fifth and Sixth Amendment rights. *See Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (holding that, when an accused is required to provide testimony in order to exercise a constitutional right, the testimony has been "compelled" within the meaning of the Fifth Amendment, and that the government may not force an accused to choose between his Fourth and Fifth Amendment rights); *Hickey,* 185 F.3d at 1065; *Hardwell,* 80 F.3d at 1484; *see also Seattle Times v. United States Dist. Ct.,* 845 F.2d 1513 (9th Cir.1988) (discussing Fifth Amendment concerns with respect to sealed financial affidavits in criminal cases). We do not express any view on these underlying constitutional questions but note that our ruling here avoids the necessity of reaching them. *See Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

ment:[12] Just prior to his getting involved in the money laundering scheme, his father was. threatened by four armed men who visited him at his home and questioned him about Ortega's willingness and ability to launder money. The men then threatened to harm his father and Ortega's wife's relatives. Ortega reported this incident to the head of security at his bank. He did not, however, report it to the police because· he believed that the police were corrupt and that the armed men could have been policemen. After this incident, Ortega noticed a strange car parking outside his residence. Soon afterwards, he was contacted by Navarro, who invited him to Los Angeles to meet some "potential investors," who turned out to be Mendoza and several undercover agents. Navarro and Mendoza drove him to the alleged business meeting, which was held in the United States at Emerald Empire. Ortega soon discovered that this was no ordinary business meeting. Both in the car and at the meeting, Mendoza made statements that Ortega interpreted as threats to the life and health of himself and his family. For example, in the car, Mendoza reportedly stated that he preferred to do business in Mexico because he had bribed the Mexican army and police, at a rate of two million dollars per month, and· therefore could "do whatever [he] pleased." At the meeting, Mendoza repeatedly alluded to the Cali cartel and its well-known reputation for violence, and he made statements that Ortega construed as

implying that he would be killed if he did not join the criminal conspiracy.[13] Ortega also claimed that after the meeting ended, he asked Mendoza if he had sent the four armed men to his father's door; Mendoza did not answer the question but smiled in a manner that led Ortega to believe that he had done so. Ortega asserts that he was convinced that if he did not cooperate with Mendoza, he would be killed or seriously injured by members of the Cali cartel, who might also kill or injure his father, his wife, or his wife's family. He stated that he had not before been involved in money laundering and that he would not have become involved but for his fear for himself and his family.

■ "Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *Poehlman*, 217 F.3d at 698 (quoting *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir.1994)). Here, Ortega would have testified that he did not realize at first that the "potential investors" from the United States were, in fact, money launderers for a major international drug operation;[14] that when he arrived at the appointment, he was informed for the first time that his new business associates were actually operatives of the Cali cartel;[15]

---

**12.** We are satisfied that the arguments in the brief are adequately supported by the allegations in the sealed record. Ortega's sealed declarations contain additional facts in support of his claim. We do not discuss them in the opinion, and they are not·necessary to our decision.

**13.** These statements are on the videotapes and were entered into evidence. ·

**14.** Once again, we mention only those facts discussed in Ortega's briefs.

**15.** Only a government official or agent can entrap a defendant. *United States v. Thickstun*, 110 F.3d 1394, 1398 (9th Cir.1997). The government contends that there can be no inducement because Ortega was recruited by another defendant, not a government agent. There is, however, a factual dispute on this point. Ortega contends that his codefendant merely invited him to participate in a legal business venture, that Mendoza was the first person to invite him to join a criminal conspiracy, and that the invitation was ac-

that he understood Mendoza's veiled threats to mean that he or members of his family would be murdered if he did not join the criminal conspiracy; and that it was these threats alone that caused him to agree to participate in the money laundering scheme.[16] Although this version of the events is not particularly convincing, a defendant need present only "some evidence," which may be "of doubtful credibility," to create a factual issue that must be resolved by a jury. *United States v. Sotelo-Murillo*, 887 F.2d 176, 178–79 (9th Cir.1989)(quotations omitted). A jury could have believed Ortega's sworn testimony; if so, it could have concluded that Mendoza's coercive threats constituted inducement because they created a substantial risk that an otherwise law-abiding person would commit a crime.

This view of the evidence is strengthened by the fact that the district court allowed Kissel, a similarly situated defendant, to present an entrapment defense. Kissel's evidence of government inducement appears to be no more convincing on its face than Ortega's. The evidence presented at trial showed that Kissel arrived at the meeting with a detailed plan for structuring the money-laundering transactions to avoid detection, and that she lobbied Mendoza for his business. The videotape of her meeting with Mendoza shows her laughing and joking, apparently eager to participate in the criminal scheme. During her testimony, however, Kissel explained that her behavior at the meeting was just an act, meant to disguise her fear.

She testified that she was petrified that she would be killed if she did not agree to join the conspiracy and that she could not contact the Mexican authorities because she believed that they were part of the scheme. She also stated that her "money laundering plan" was really a business plan she had concocted to help persons who she thought were wealthy investors who wanted to avoid paying Mexican taxes. In sum, although Kissel had no more evidence of government inducement than Ortega, she was allowed to present her defense. She was acquitted, and Ortega might conceivably have been as well, as long as he could show that he lacked a predisposition to commit the crime.

■■■ We have held that five factors are relevant to examining predisposition: (1) the character or reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. *Becerra*, 992 F.2d at 964. We have also stated that, although none of these factors alone controls, the most important is the defendant's reluctance to engage in criminal activity. *Id.* In this case, accepting Ortega's factual assertions as correct, the third factor weighs against Ortega, while the first, second, and fifth factors probably favor him. The fourth factor at first blush appears to weigh against Ortega; however, as Operation Checkmark itself demonstrates, appearances are sometimes deceiv-

---

companied by a number of highly alarming threats. If the jury believed Ortega's version of events, it could have found government inducement. Thus, we need not reach any question as to whether Mendoza's dealings with Navarro resulted in any responsibility on the part of the government for any inducement of Ortega in which Navarro may have engaged.

**16.** As is the case with respect to the possible issue regarding the government's responsibility for any acts of inducement on Navarro's part, we need not reach the question of the government's responsibility for the actions of the four armed men who allegedly threatened his father. We do not rely on that evidence when deciding the inducement issue.

ing. Like Kissel, Ortega maintains that his apparent lack of reluctance was caused by his fear of Mendoza and the ruthless individuals for whom Ortega believed he worked. Under these circumstances, the fourth factor must be deemed to favor Ortega, or at worst to be neutral. Ortega has offered a plausible explanation as to why he did not manifest the reluctance he claimed he felt. A criminal defendant who acts out of fear does not forfeit his right to present an entrapment defense simply because he agrees, seemingly without reluctance, to commit a crime. The credibility of the defendant's explanations is a matter for the jury to determine.

We also note that it is the government's burden to prove predisposition beyond a reasonable doubt. *Jacobson v. United States*, 503 U.S. 540, 548–49, 112 S.Ct. 1535, 118 L.Ed.2d 174. In this case, there is no evidence in the record that Ortega had engaged in money laundering, or indeed in any form of criminal activity, prior to his involvement in this case, and Ortega contends that he joined the conspiracy only *after* his father was approached and threatened by four armed men and only *after* he himself was put in fear by a government agent who was pretending to work for the Cali cartel.[17] Ortega averred that he was not predisposed and affirmatively stated that he had never engaged in money laundering, or any other criminal activity, before his meeting with Mendoza. Because there was no evidence of predisposition beyond the fact that Ortega joined the conspiracy, the jury could have believed that he lacked the predisposition to become a money launderer.

Ortega's entrapment defense was not strong. However, as we have stated, only "slight evidence" entitles a defendant to present his defense to the jury. *Becerra*, 992 F.2d at 963. Ortega presented "slight evidence" on both elements of the entrapment defense. The weight and credibility of that evidence were matters for the jury to determine. Accordingly, we must reverse Ortega's conviction. On retrial, he shall be permitted to present an entrapment defense.

## 2. Labrada

Although Labrada, unlike Ortega, did not object to the district court's order precluding him from introducing affirmative evidence of entrapment, his counsel moved for an instruction on that defense at the jury instruction conference following the close of evidence.[18] He contended that the evidence introduced by the prosecution was sufficient to show government inducement and that there was no evidence that he was predisposed to commit the crime. The district court denied the motion without explanation and reiterated that only Kissel would be allowed an entrapment instruction. On appeal, we conclude that, although a criminal defendant who has not introduced affirmative evidence of entrapment may nevertheless be entitled to a jury instruction on that defense should the

---

17. The four armed men are unquestionably relevant to predisposition, as opposed to inducement, because they shed light on Ortega's state of mind. Ortega's belief that, prior to the meeting, his father was stalked and threatened by representatives of the Cali cartel lends credibility to his testimony that he agreed to participate in the scheme because of fear, not on account of a criminal propensity.

18. The standard of review for the court's decision not to provide the jury with a requested entrapment instruction is unsettled. *See Becerra*, 992 F.2d at 963. We need not address whether de novo or abuse of discretion review is required, however, because the standard of review does not affect the outcome. *Id.*

government's evidence justify such an instruction, Labrada was not so entitled under the circumstances of this case.

 As mentioned, the defense of entrapment contains two elements: government inducement of the crime and absence of predisposition on the part of the defendant. *Poehlman,* 217 F.3d at 697. "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) (citation omitted). A defendant is entitled to an entrapment instruction whenever there is sufficient evidence in the record from which a reasonable jury could find entrapment. *Id.* at 62, 108 S.Ct. 883. Labrada asserts that the government led him to believe that the venture in which he engaged was legitimate, and that he had no intention of engaging in, or knowledge that he was engaging in, criminal conduct. In other words, he argues that Mendoza induced him to commit a crime by tricking him into thinking that his actions would be entirely legal. On that basis, he urges that the jury could have found that Mendoza's conduct created "a substantial risk" that he, an "otherwise law-abiding citizen," would become an international money launderer, and thus that he was "entrapped." *Poehlman,* 217 F.3d at 698.

We need not decide whether these facts, and the attendant legal theory of inducement by trickery, entitled Labrada to an entrapment instruction, because it is clear that Labrada suffered no harm by the district court's refusal to give that instruction. *See Bradley v. Duncan,* 315 F.3d 1091, 1099 (9th Cir.2002) (stating that harmless error analysis applies to a trial judge's failure to instruct the jury on entrapment). Money laundering is a specific intent crime, and it requires knowledge on the part of the defendant. *See* 18 U.S.C. § 1956(a). In this case, Labrada testified that he was under the mistaken impression that he was conducting legitimate business transactions and that he therefore lacked knowledge and the specific intent to commit the crime. The jury, however, plainly did not believe him. Had the jury accepted Labrada's story that he did not know that he was engaging in illegal activity, and that he had no intent to do so, it would have had no choice but to acquit him of the charges. By its guilty verdict, however, the jury necessarily determined that Labrada had the specific intent to commit the charged offenses, that he knowingly joined the criminal conspiracy, and that he was not tricked by wily government agents into becoming an unwitting international money launderer. In these circumstances, even if the jury had been given the requested entrapment instruction, it could not have found for Labrada on the basis of his "entrapment by trickery" theory. That theory is completely inconsistent with the guilty verdict at which it arrived. Accordingly, if the district court erred in refusing the instruction, the error was harmless. *See, e.g., Pollard v. White,* 119 F.3d 1430, 1434 (9th Cir.1997) (stating that in order to determine whether an instructional error was harmless, we must examine "the findings necessarily made by the jury"). We therefore must affirm Labrada's convictions.[19]

### C. Remaining Claims

 Labrada and Barraza allege that the cumulative effect of the district

---

**19.** In addition to money laundering, Labrada was also convicted of aiding and abetting and conspiracy to commit money laundering.

court's erroneous evidentiary rulings and improper interference with their questions of prosecution witnesses violated their Fifth and Sixth Amendment rights to due process, a fair trial, and cross examination.[20] We review this claim for abuse of discretion. *United States v. Pearson,* 274 F.3d 1225, 1233 (9th Cir.2001). When the claim is that the district court erred by sustaining too many objections, we will reverse only if the sustained objections "amounted to, or contributed to the denial of a fair trial." *Id.* (citations omitted). Many of the examples offered by Appellants are simply quotations taken out of context. Although the district court strictly limited cross examination to rebuttal of matters raised on direct examination, it made clear that Appellants could recall the state's witnesses as part of their cases-in-chief if they wished to question them on matters not covered by direct examination. The district court did not prevent Appellants from engaging in a searching and effective cross examination of Mendoza or any other prosecution witness. Labrada and Barraza were permitted to deny, and did deny, the elements of the crime. We have examined each of the instances cited by Appellants, and we conclude that they were not denied a fair trial and that the district court did not abuse its discretion.

Labrada contends that his trial counsel was constitutionally ineffective for failing to pursue a sentencing reduction for imperfect entrapment. This court reviews ineffectiveness claims on direct appeal only when the record is sufficiently developed to permit review or the legal representation was so inadequate that the defendant was obviously denied his Sixth Amendment right to counsel. *United States v. Benlian,* 63 F.3d 824, 826 n. 3 (9th Cir.1995).

Here, the record is not sufficiently developed with respect to whether counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, the ineffectiveness claim is dismissed without prejudice to its being raised in a § 2255 petition.

Barraza asserts that he experienced a constructive denial of counsel because his attorney had laryngitis for several days; he insists that we must presume prejudice and remand for a new trial. *See United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). This we cannot do. *See, e.g., Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). We note, however, that the record contains evidence that his counsel was seriously ill throughout the trial, and that she died shortly thereafter, and that Barraza was represented by different counsel at sentencing. Accordingly, if Barraza wishes to argue that his trial counsel was constitutionally ineffective because of her illness, he may do so in a § 2255 petition; but, he must then demonstrate *Strickland* prejudice.

Finally, Barraza postulates that, at the very least, his case should be remanded for resentencing because of a factual error made by the district court. The district court adjusted Barraza's offense level by five on the ground that he had laundered over $1 million; however, the evidence showed that he actually laundered only $950,000. The government agrees that Barraza was incorrectly sentenced. At the request of both parties, we remand his case for resentencing.

---

20. This claim was presented in the joint opening brief, in which Ortega joined. Because we reverse his case on the ground of entrapment, we do not consider this issue as it applies to him.

### III. Conclusion

We hold that Ortega's sealed declarations are protected from disclosure on appeal. We also hold that the district court erred when it refused to allow him to present a defense of entrapment. We dismiss the remaining claims, with the exception of the one pertaining to Barraza's sentence. We affirm Labrada's conviction and sentence, as well as Barraza's conviction, but we remand Barraza's case for resentencing according to the correct amount of loss. Ortega's conviction is set aside, and his case is remanded for further proceedings.

AFFIRMED in part; REVERSED in part; and REMANDED in part.