NOONAN, Circuit Judge,
dissenting:
“Lead us not into temptation” is part of a prayer familiar to many. But few, I believe, would think of this prayer as addressed to the government of the United States or would think it necessary to address the government with such a request. The present case creates a precedent and sets a framework in which such a prayer addressed to the government becomes comprehensible and probable. Today our court gives our approval to the government tempting persons in the population at large currently engaged in innocent activity and leading them into the commission of a serious crime, which the government will then prosecute.
The government of the United States paid a confidential informant (Cl) $100 a day to recruit random persons willing to rob a cocaine stash house. Brought from Miami to Phoenix by Agent Richard Zayas of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Cl testified that he went to bars in “a bad part of town” and that he was not instructed to look for particular individuals who were already involved in an ongoing criminal operation, but simply to recruit anyone who showed an interest in his conversation.
The Cl described his modus operandi in these words:
Q. All right. And in your efforts to recruit these robbers, what instructions, what specific instructions were you given by Agent Zayas?
A. What instructions? Just to go out and, you know, say-just trying to see what I can meet back — you know, meet people. Meet people, see if they know bad guys, you know.
Q. Anyone off the street. Is that basically it?
A. Pretty much. No, not — yeah. I mean, yeah, I go to the bars.
Q. Right. Now, how do you determine if a person is a bad person without knowing them or without observing them being engaged in a crime?
A. Well, it’s hard to determine.
Q. Does [Agent Zayas] tell you [to] look only for persons who you know are about to commit a crime?
A. No.
Q. No. And, in fact, you have approached people at restaurants randomly and have raised potential criminal activity, have you not?
A. Yes.
The Cl selected a seedy bar as a fit place to troll and then trolled for potential defendants. After several tries, the Cl was introduced to Simpson, who expressed an interest. The Cl brought Simpson to *314 Zayas, who himself was undercover, posing as a former courier of a Mexican drug ring anxious to be revenged on his former associates. Zayas told Simpson of a stash house where once a month there was cocaine awaiting transportation. In a second meeting with Zayas twelve days later, Simpson introduced Black as a recruit to the robbery, adding that no more men would be needed. Zayas suggested Simpson would need more help, and the others agreed to one more. At a third meeting with Zayas, Simpson, and Black, three more persons were recruited. The next day, Timmons appeared for the first time as the driver. Simpson did not show up, afraid that he was under surveillance. Zayas told the men that he had rented a warehouse to store his portion of the cocaine and asked them to follow him there. Upon reaching the warehouse, the men were arrested by federal agents. Simpson was arrested three months later.
These facts are not disputed. They establish that Zayas and the Cl, acting for the ATF, recruited Simpson to rob the stash house and that Zayas encouraged Simpson to increase the number of robbers; that all of the defendants were informed of the plan to rob a stash house; that unknown to them, the stash house itself did not exist; and that Zayas proposed its robbery as the purpose of the plan. From the start when the Cl contacted Simpson to the end when Zayas told the crew to follow him to the warehouse, the agents of the government wrote the crime-script and conducted the defendants in the execution of it.
The opinion of the majority does not hesitate to say, “Moreover, the stash house robbery was entirely the ATF’s creation, and it was Zayas who set the parameters for how it had to be carried out.” Op. at 305. The crimes of conviction, the opinion states, “resulted from an operation created and staged by ATF---- Zayas invented the scenario including the need for weapons and for a crew, and the amount of cocaine involved.” Id. at 303. As the majority acknowledges, the government had no particular information about the defendants that would have made them plausible targets of an investigation. There was a “risk inherent,” the majority agrees, “that the government could create a criminal enterprise that would not have come into being but for the temptation of a big payday, a work of fiction spun out by government agents to persons vulnerable to such a ploy who would not otherwise have thought of doing such a robbery.” Id. at 303.
The majority opinion does not give full weight to Zayas’s suggesting an increase in the numbers of the conspirators nor to Zayas’s directing the conspirators to the location of the imaginary stash house. These omissions apart, the majority opinion lays out in convincing detail how, from beginning to end, the government wrote the script, found those who would act in it, and brought its dupes together so that they could be arrested.
The majority opinion shifts its ground to argue that precedent justifies its absolution of the ATF. The majority finds “the most analogous case” to be United States v. Bagnariol, 665 F.2d 877 (9th Cir.1981). Op. at 305. The majority opinion relies on Bagnariol to show that the government may trap persons not currently engaged in crime. But in that case in proving that the defendants had violated RICO, the government showed that they were part of an “enterprise” for the purpose of “legalizing and controlling certain unlawful gambling ... all through acts involving extortion, bribery, mail fraud....” Bagnariol, 665 F.2d at 891 (quotation marks omitted). These criminal acts were charged as acts the defendants were currently engaged in. *315 The court concluded: “The government adequately proved these activities.” Id. The defendants were not convicted or punished for past lawful activities.
The majority finds its concerns “mitigated to a large degree” by the claims of Simpson and Black that they had engaged in similar criminal activity in the past. Op. at 306-07. With this argument, the majority opens a new ground for the government to justify setting up a defendant. Taking Black and Simpson’s boasts as true, why do the boasts make the boasters fair game for a government ploy? In fact, the presentence reports on these defendants in this case show no stash house activity by either of them. In the population of this country, there is an indefinite number of persons who dream of clever and unlawful schemes to make money. Does their dreamy amorality cast them all as fit candidates for a sting by their government? Depraved as a person’s imagination and hopes may be, what is imagined and hoped are not the subjects of criminal justice. The majority’s rationale for permitting the government to tempt the general population to crime imposes no limits upon the imagination of agents of the government.
Besides Bagnariol, the government searches among its previous stings to find a precedent for what the government did here. The search has not been productive. The government cites cases where the defendants asserted a defense of outrageous government conduct and failed to establish the defense. In United States v. Stenberg, 803 F.2d 422 (9th Cir.1986), the defendants were already engaged in the type of illegal transactions the government sought to shut down, id. at 430. In United States v. Bonanno, 852 F.2d 434 (9th Cir.1988), the defendants were already involved in an illegal purchase order scheme, id. at 438. In United States v. Pemberton, 853 F.2d 730 (9th Cir.1988), the defendant was a long-time drug dealer already involved in money laundering, id. at 732. In United States v. Garza-Juarez, 992 F.2d 896 (9th Cir.1993), the defendants were already known to take part in a pre-existing illegal firearm trafficking scheme, id. at 900. In United States v. Gurolla, 333 F.3d 944 (9th Cir.2003), one of the largest undercover operations in history, the defendants were already part of a massive money laundering scheme in which Mexican banks laundered money to various drug cartels, id. at 948. In United States v. Williams, 547 F.3d 1187 (9th Cir.2008), the defendant was already wanted for a prior bank robbery; had engaged in several drug deals with a government informant; and had planned his second bank robbery in detail and on his own accord, going so far as to identify a target bank and recruit someone on the inside of the bank to help. It was only after the defendant enlisted a government informant to be his getaway driver that the ATF pitched the fictitious drug stash house as a safer alternative to robbing a bank. Id. at 1192. In each of these cases, the government targeted an existing scheme or suspected an individual of wrongdoing before initiating a sting operation.

An Alternative Approach

The majority opinion scarcely offers an explanation for why it has declined to use the Bonanno test. The test is good law. Under the Bonanno test, the government’s conduct is not outrageous when:
(1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent’s participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal *316 activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.
Williams, 547 F.3d at 1199-1200 (quoting Bonanno, 852 F.2d at 437-38 and evaluating whether the government’s conduct is outrageous by methodically considering each of the five factors). The origin of the test lay in United States v. Bogart, 783 F.2d 1428 (9th Cir.), vacated in part on reh’g sub nom. United States v. Wingender, 790 F.2d 802 (9th Cir.1986). Systematically evaluating a number of outrageous government conduct cases, Bogart concluded that “constitutionally unacceptable” are cases where the “crime is fabricated entirely by the police to secure the defendant’s conviction rather than to protect the public from the defendant’s continuing criminal behavior.” Id. at 1438.
The majority opinion concedes that the government here fails the first, fourth, and fifth factors of the Bonanno test. Op. at 304-08. It is undisputed that the defendants were not involved in a continuing series of similar crimes or a criminal enterprise already in progress; that the agents did not infiltrate a criminal organization; and the agents did not approach persons already contemplating or engaged in criminal activity.
The cases that decline to use the Bonanno test articulate a guiding principle. In United States v. Gurolla, 333 F.3d 944 (9th Cir.2003), for instance, a case that the majority notes as declining to use the Bonanno test, see Op. at 308 n. 7, this court stated that our lodestar in determining whether the government conduct is outrageous is whether “the government did not initiate the criminal activity, but rather sought to crack an ongoing operation,” Gurolla, 333 F.3d at 950. Plainly, no ongoing operation existed here. Plainly the government here did initiate the criminal activity.
The majority declares that its “concerns that [the government] sought to manufacture a crime that would not have otherwise occurred” are “mitigated to a large degree.” Op. at 307. This mitigation is due to Simpson and Black telling Zayas that they had done similar stash house robberies. These repeated assurances “quickly supplied,” the majority says, “reasons to suspect they were likely to get involved in stash house robberies.” Id. at 307.
Nothing in the presentence reports on Black and Simpson shows that they had ever engaged in a stash house robbery. At least as far as the government knew, they were simply boasting. For the government agents to believe the boasts may have been reasonable. But the boasts did not show them to be currently engaged in this kind of crime. As far as the government agents knew or believed, Black and Simpson were neither committing a crime nor engaged in planning a crime.
According to the presentence reports on the defendants submitted by the government, Black as an adult of 18 had been convicted of auto theft and at age 23 had been sentenced to 90 days in jail for bank robbery. His criminal history points totaled 7. Mahon as an adult of 21 had been convicted of criminal possession of a weapon and sentenced to six months in jail and had at age 24 been sentenced to six months for possessing marijuana, with criminal history points totaling 5. Alexander as an adult was fined three times for driving on a suspended license. His criminal points totaled zero. Timmons at age 15 was convicted as an adult for robbery in taking another person’s automobile by force, sentenced to jail for 5 months, and thereafter returned to jail on several occasions for violation of probation. He also *317 has several domestic violence convictions, and he twice has been convicted of the felony of possessing marijuana. His criminal history points totaled 16.
No federal crimes are attributed to any of these four defendants. One defendant has no criminal history points in his record. Another has only five. Even Timmons’ more checkered past reflects no major criminal activity. Nothing the government knew and nothing that the government later discovered about their past showed that the defendants were ready to rob a stash house.

The Amount Of Drugs Was Invented By The ATF

More than 600 persons have been prosecuted for attempting to rob stash houses which were fictitious. See Brad Heath, ATF Uses Fake Drugs, Big Bucks to Snare Suspects, USA Today, June 28, 2013, at 1A. According to ATF’s special operations chief, the sentence that the ATF seeks is fifteen years. Id.
Our court has voiced concerns at least twice over the government’s “unfettered ability” to set the sentence by inflating the fictitious amount of drugs in the fictitious drug house: United States v. Yuman-Hernandez, 712 F.3d 471, 474 (9th Cir.2013); United States v. Briggs, 623 F.3d 724, 729-30 (9th Cir.2010). See also United States v. Caban, 173 F.3d 89, 93 (2d Cir.1999). In none of these cases have the courts disapproved the government’s power.
Fictitious stash house stings “are a disreputable tactic,” Judge Posner has written, because “[l]aw enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences.” United States v. Kindle, 698 F.3d 401, 414 (7th Cir.2012) (Posner, J., dissenting), cert. denied, — U.S.-, 133 S.Ct. 1743, 185 L.Ed.2d 800 (2013), reheard en banc sub nom. United States v. Mayfield (7th Cir. Apr. 16, 2013). Judge Posner observes:
And now consider the role of such stings in the “war on drugs.” Are they likely to reduce the sale and use of illegal drugs? No; they are likely to have the opposite effect. Stash house robbers do not increase the amount of drugs in circulation, since they steal their drugs instead of making or importing them. The effect of a fictitious stash house sting, when the person stung is, unlike [Defendant], a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber ... and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses — security obtained at no cost to the operators of stash houses — reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business’s costs, the lower the prices charged consumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would pay law enforcement to sting potential stash house robbers.
Id. at 416.
Not only are Judge Posner’s observations well taken, it is a denial of due process for sentences to be at the arbitrary discretion of the ATF. The agency creating the fictitious stash house can place any amount of imaginary drugs within it. The amount must, no doubt, be plausible; this limit aside, the ATF may make the object of the robbery as large as it chooses, thereby effectively choosing the criminal penalties the defendants will in *318 cur. The ATF has free rein to amplify these penalties and influence the number of defendants by, as in our case, inventing armed guardians of the imaginary drugs. In other cases, nothing stops the government from filing additional charges and obtaining sentencing enhancements where the defendants, at the government’s insistence, are found carrying explosives, body armor, or machine guns.

Conclusion

To sum up, use of an imaginary stash house has no effect on the actual circulation of illegal drugs but may make actual stash houses more secure; the imaginary stash house also gives the government essentially unchecked power to increase the number of persons drawn in as robbers by supplying the number of imaginary guards for the drugs and by supplying the amount of imaginary drugs that are supposed to be present. The power exercised by the government is not only to orchestrate the crime but to control and expand those guilty of it. I do not see how this power can be rationally exercised. No standard exists to determine the limits of the government’s discretion.
The four defendants were a portion of the population of Phoenix unknown by the government to harbor any specific criminal plans. Never in their past had they been convicted of a crime of such proportions or a federal crime of any kind. They were inveigled by the ATF to agree to commit a crime which in fact was impossible to commit because the stash house they agreed to rob did not exist. Besides providing this imaginary target for their crime, the ATF brought the Cl from Miami to recruit them, fed them Zayas’s cover story as to his own motivation, told them of the target to be robbed with detail as to its contents and guards, coached them as to the number of persons needed for the job, and directed them to where they would be arrested. The ATF wrote the script, cast the defendants as the actors, and directed the action to its denouement.
The United States has enormous resources that could be used to tempt and trap criminals. If these resources are deployed to bring an ongoing criminal enterprise to justice, the country is well served. If these resources are deployed to fire the imaginations of dreamers of easy wealth and turn them to conspiring to commit a crime, our government has been the oppressor of its people.
Massively involved in the manufacture of the crime, the ATF’s actions constitute conduct disgraceful to the federal government. It is not a function of our government to entice into criminal activity unsuspecting people engaged in lawful conduct; not a function to invent a fiction in order to bait a trap for the innocent; not a function to collect conspirators to carry out a script written by the government. As the executive branch of our government has failed to disavow this conduct, it becomes the duty of the judicial branch to refuse to accept these actions as legitimate elements of a criminal case in a federal court.