In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3825

Alliance to End Repression, et al.,

Plaintiffs-Appellees,

v.

City of Chicago,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 74 C 3268, 74 C 3295--Ann Claire Williams, Judge.

Argued November 27, 2000--Decided January 11, 2001

Before Bauer, Posner, and Easterbrook, Circuit Judges.

Posner, Circuit Judge.  More than a quarter of a century ago a number of individuals and organizations brought suit under 42 U.S.C. sec. 1983 against the United States and the City of Chicago, claiming that the FBI's Chicago office and the Chicago Police Department's intelligence division were violating the plaintiffs' First Amendment rights by overly intrusive and improperly motivated investigations of alleged subversive activities. In 1981, before a trial could be held, the defendants agreed to a consent decree, which was approved by then district judge Getzendanner the following year, imposing detailed and onerous restrictions on the defendants' powers of investigation. 561 F. Supp. 537 (N.D. Ill. 1982). The City has now asked the district court to modify the decree to make the restrictions that it places on the City less onerous. Fed. R. Civ. P. 60(b)(5). The district court has refused, and the City has appealed, pointing out that the decree is so strict that Judge Getzendanner said she would not have awarded the plaintiffs such draconian relief (but for the defendants' acquiescence) even if they had proved all the allegations of their complaint in a trial. 561 F. Supp. at 551.

The City argues that it has been in compliance with the decree throughout the almost two decades in which the decree has been in force and it

points out that during this period the Supreme Court and this court have become ever more emphatic that the federal judiciary must endeavor to return the control of local governmental activities to local government at the earliest possible opportunity compatible with achievement of the objectives of the decree that transferred that control to the federal courts. The City also argues that the culture of local law enforcement and the character of the threats to public safety by ideologically motivated criminals have so far changed as to make much of the decree obsolete and points out that the Supreme Court has adopted a more flexible standard for the modification of decrees entered in institutional reform litigation than the Swift standard of yore. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378-81 (1992); Board of Education v. Dowell, 498 U.S. 237, 248 (1991); see also Alexander v. Britt, 89 F.3d 194, 197-98 (4th Cir. 1996). Although the federal government has not joined the City in seeking to modify the decree, the provisions applicable to the FBI are different and were interpreted by us in an earlier phase of this litigation to impose far lighter restrictions on FBI investigations than the district court had interpreted the decree to impose. Alliance to End Repression v. City of Chicago, 742 F.2d 1007 (7th Cir. 1984) (en banc).

The core of the decree, which the City does not seek to modify, forbids investigations intended to interfere with or deter the exercise of the freedom of expression that the First Amendment protects, and requires the City to commission independent periodic audits of the City's compliance with the decree. The effect of these provisions is to add the threat of civil and criminal contempt to the usual sanctions for infringing civil rights and, through the requirement of the audits, to make it easier to detect such infringements. These are substantial enhancements of the ordinary deterrent effect of constitutional law. Id. at 1014-15. They annex swift and severe sanctions to the ordinary tort remedies (mainly 42 U.S.C. sec. 1983) for violations of that law.

The periphery of the decree, which the City considers insufficiently protective of the public safety and wishes to have lanced, comprises a dizzying array of highly specific restrictions on investigations of potential terrorists and other politically or ideologically motivated criminals. Investigations "directed toward First Amendment conduct," a defined term referring to any investigation likely to involve the collection of information about protected activity or the investigation of anyone engaged in such activity, may be conducted only for the purpose of

obtaining evidence of past, present, or impending criminal conduct and only if the Chicago police already have a reasonable suspicion of such conduct. Unless "unavoidably necessary to the investigation of a reasonably suspected crime," the police may not collect information about the political group to which the target of an investigation belongs or about other members of the group or people attending the group's meetings. The investigation must terminate as soon as reasonable suspicion of criminal conduct is dispelled and upon termination all information protected by the First Amendment must be purged from the investigatory file. An investigation may not be conducted on the basis of mere advocacy of violent conduct (what the decree terms "ideological rhetoric"); only a "brief preliminary inquiry" is permitted on that basis and it must cease unless it generates a reasonable suspicion of criminal conduct. Use of undercover informants is strictly limited along with the gathering of information at rallies or other public assemblies of advocates of violence and other political extremists. There is more to the decree, and some qualifications and other nuances that we have omitted, but our summary gives the flavor.

From the 1920s to the 1970s the intelligence division of the Chicago Police Department contained a unit nicknamed the "Red Squad" which spied on, infiltrated, and harassed a wide variety of political groups that included but were not limited to left- and right-wing extremists. Most of the groups, including most of the politically extreme groups, were not only lawful, and engaged in expressive activities protected by the First Amendment, but also harmless. The motives of the Red Squad were largely political and ideological, though they included a legitimate concern with genuine threats to public order. Demonstrations against U.S. participation in the Vietnam War that climaxed in the disruption of the Democratic National Convention in Chicago in 1968, race riots in Chicago and other major cities in the same period, and the contemporaneous criminal activities of the Black Panthers, the Weathermen, and Puerto Rican separatists, all against a backdrop of acute racial and Cold War tensions, political assassinations (notably of President Kennedy, Senator Robert Kennedy, and Martin Luther King, Jr.), and communist subversion, fueled a widespread belief in the need for zealous police activity directed against political militants.

The era in which the Red Squad flourished is history, along with the Red Squad itself. The instabilities of that era have largely

disappeared. Fear of communist subversion, so strong a motivator of constitutional infringements in those days, has disappeared along with the Soviet Union and the Cold War. Legal controls over the police, legal sanctions for the infringement of constitutional rights, have multiplied. The culture that created and nourished the Red Squad has evaporated. The consent decree has done its job. To this the plaintiffs reply mainly by pointing us to accusations that during the 1996 Democratic National Convention, the first to be held in Chicago since the disaster of 1968, some Chicago police officers, fearing a repetition, reverted to the old ways and harassed demonstrators. But that was at worst a temporally limited, an isolated, and very much a situation-specific lapse; in its ad hoc, unorganized, and episodic character it resembled not at all the activities of the Red Squad, which were organized, systematic, and protracted.

Mere compliance with a decree over a period of years, the plaintiffs argue, does not in itself justify the lifting of the decree. We have our doubts whether this position is correct when the period of substantial compliance is as long as it has been in this case and the decree is one that constrains a core function of state (or, what for these purposes is the same thing, local) government as tightly as this one does. The states and their subdivisions have a right to the restoration of control over the institutions of state and local government upon proof of decades of compliance with a decree that had shifted that control to a federal judge. See Missouri v. Jenkins, 515 U.S. 70, 99 (1995); Bogard v. Wright, 159 F.3d 1060, 1065 (7th Cir. 1998); People Who Care v. Rockford Board of Education, 153 F.3d 834 (7th Cir. 1998) (per curiam); United States v. Board of School Commissioners, 128 F.3d 507, 510 (7th Cir. 1997). Federal decrees that hand ultimate control of state functions to federal courts "are not intended to operate in perpetuity." Board of Education v. Dowell, supra, 498 U.S. at 248; United States v. Board of School Commissioners, supra, 128 F.3d at 510. These cases involved school-desegregation decrees but their principles apply with equal force to police-reform decrees. Policing is as much, and as important, a local function as education.

The City in any event is asking only that the decree be modified, not that it be abrogated; and its grounds for modification go beyond a mere history of compliance. The City wants flexibility to meet new threats to the safety of Chicago's citizens. In the heyday of the Red Squad, law enforcers from J. Edgar Hoover's FBI on down to the local level in Chicago focused to an

unhealthy degree on political dissidents, whose primary activity was advocacy though it sometimes spilled over into violence. Today the concern, prudent and not paranoid, is with ideologically motivated terrorism. The City does not want to resurrect the Red Squad. It wants to be able to keep tabs on incipient terrorist groups. New groups of political extremists, believers in and advocates of violence, form daily around the world. If one forms in or migrates to Chicago, the decree renders the police helpless to do anything to protect the public against the day when the group decides to commit a terrorist act. Until the group goes beyond the advocacy of violence and begins preparatory actions that might create reasonable suspicion of imminent criminal activity, the hands of the police are tied. And if the police have been forbidden to investigate until then, if the investigation cannot begin until the group is well on its way toward the commission of terrorist acts, the investigation may come too late to prevent the acts or to identify the perpetrators. If police get wind that a group of people have begun meeting and discussing the desirability of committing acts of violence in pursuit of an ideological agenda, a due regard for the public safety counsels allowing the police department to monitor the statements of the group's members, to build a file, perhaps to plant an undercover agent.

All this the First Amendment permits (unless the motives of the police are improper or the methods forbidden by the Fourth Amendment or other provisions of federal or state law, see Alliance to End Repression v. City of Chicago, supra, 742 F.2d at 1014-15, and cases cited there), but the decree forbids. The decree impedes efforts by the police to cope with the problems of today because earlier generations of police coped improperly with the problems of yesterday. Because of what the Red Squad did many years ago, today's Chicago police are fated unless the decree is modified to labor indefinitely under severe handicaps that other American police are free from. First Amendment rights are secure. But under the decree as written and interpreted, the public safety is insecure and the prerogatives of local government scorned. To continue federal judicial micromanagement of local investigations of domestic and international terrorist activities in Chicago is to undermine the federal system and to trifle with the public safety. Every consideration favors modification; the City has made a compelling case for the modification that it seeks.

Modification is not abrogation. The modified decree will leave the Chicago police under

considerably greater constraints than the police forces of other cities. A violation of the constitutional rights of any person whom the Chicago police investigate will be a violation of the decree and not just of the Constitution itself and so will invite summary punishment by the exercise of the contempt power, while the requirement of outside audits will make it more difficult for the Chicago police than for their counterparts in the other big cities to commit constitutional violations undetected.

The judgment of the district court is reversed and the case remanded with instructions to make the modifications in the consent decree that the City has requested.