# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

DAVID CARY MAYER, aka David
Cory Mayer,
          *Defendant-Appellant.*

No. 06-50481

D.C. No.
CR-05-00343-JTM

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
February 9, 2007—Pasadena, California

Filed June 6, 2007
Amended June 20, 2007
Second Amendment September 17, 2007

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Hall

12411

## COUNSEL

Benjamin L. Coleman, San Diego, California, for the appellant.

Anne Kristina Perry, Assistant United States Attorney, San Diego, California, for the appellee.

---

## ORDER

The amended opinion filed June 20, 2007, is amended as follows:

1)  p.7438, l.25: Replace "no" with "limited"

2)  p.7439, l.24: Replace "By mentioning these two considerations, *Aguilar* does not create a sui generis standard for evaluating undercover investigations. Instead, it draws out relevant principles from existing doctrine."
    with
    "By mentioning these two considerations, *Aguilar* draws out relevant principles from existing doctrine."

3)  p.7441, l.9: Replace "The cases mentioned in *Aguilar* suggest that, so long as the government has a legitimate law enforcement purpose, the First Amendment requires no further judicial supervision,"
    with
    "The cases cited in *Aguilar* suggest that, to avoid running afoul of the First Amendment, the government must not investigate for the purpose of violating First Amendment rights, and must also have a legitimate law enforcement purpose. Alternatively, the government can satisfy its burden by showing that its interests in pursuing legitimate law enforcement obligations outweigh any harm to First Amendment interests."

4)  p.7441, l.18: Delete ", but nothing more".

5)  p.7442, l.1: Replace "In similar litigation, the Seventh Circuit has reiterated that the First Amendment does not

shield targets from investigations conducted for proper law enforcement purposes, within established constitutional bounds,"

with

"In similar litigation, the Seventh Circuit has reiterated that investigations of First Amendment-protected organizations must have a proper law enforcement purpose."

6) p.7442, l.20: Replace "the court explained, these lesser First amendment costs would be easily outweighed by the public safety benefits,"

with

"the court explained, "a less immediate danger will justify the government's action."

7) p.7442, l.31: Replace "Though they reach different results, the *Alliance* and *Handschu* actions both define the inquiry as one about proper purposes,"

with

"Though they reach different results, the *Alliance* and *Handschu* actions both consider whether investigations have a legitimate law enforcement (purpose, and the extent to which they impinge on First Amendment freedoms."

8) p.7442, l.34: Replace "We agree and clarify that good faith, under *Aguilar*, requires that an investigation threatening First Amendment rights, like any government investigation, be justified by a legitimate law enforcement purpose,"

with

"We agree and clarify that good faith, under *Aguilar*, requires that an investigation threatening First Amendment rights, like any government (investigation, be justified by a legitimate law enforcement purpose that outweighs any harm to First Amendment interests."

9) p.7443, l.1: Replace "This undercover investigation was so justified,"
with
"This undercover investigation was so justified, and was not carried out for the purpose of abridging First Amendment freedoms."

10) p.7443, l.18: Replace "and that is all we require"
with
"and there is no evidence that the government undertook its investigation in order to abridge First Amendment freedoms. Here, its interests in pursuing legitimate law enforcement objectives outweighed any harm to First Amendment interests. Therefore, the government's infiltration of NAMBLA was not unlawful."

11) p.7435, l.9: Replace the sentence beginning "Taken together . . ."
with,
"Taken together, *N.A.A.C.P.* and *Gibson* hold that compelled disclosure of membership lists violates the Constitution only when the investigation would likely impose hardship on associational rights not justified by a compelling interest, or when the investigation lacks a substantial connection to a subject of overriding and compelling state interest."

12) p.7435, l.24: Replace the sentence beginning "In this case . . ."
with
"In this case, we do not believe that the FBI investigation likely imposed any significant hardships on the associational rights of NAMBLA members or lacked a substantial connection to a subject of overriding and compelling state interest."

With this amendment, the panel has voted to deny appellant's petition for panel rehearing and has recommended

denial of the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are DENIED. No further petitions for rehearing shall be entertained.

## OPINION

HALL, Senior Circuit Judge:

David Cary Mayer (Mayer) appeals his conviction for travel with intent to engage in illicit sexual conduct under 18 U.S.C. § 2423(b). He argues that the district court should have dismissed the charges against him because the investigation that led to his arrest violated the First, Fourth, and Fifth Amendments. Specifically, Mayer contends that the government lacked reasonable suspicion when it sent an undercover agent to meetings of the North American Man/Boy Love Association (NAMBLA) and that the agent improperly instigated criminal conduct among its members. The district court denied Mayer's motion to dismiss the indictment on these grounds, and we affirm.

I.

Formed in 1978, NAMBLA considers itself "a political, civil rights and educational organization," which is, according to its Web site, opposed to age-of-consent laws and "all other restrictions which deny men and boys the full enjoyment of their bodies and control over their own lives." NAMBLA also functions as a support network for its estimated 200-300 members. *See Melzer v. Bd. of Educ.*, 336 F.3d 185, 189 (2d Cir. 2003). To this end, it hosts annual conventions across the

United States, publishes a newsletter called "The Bulletin," and facilitates correspondence with incarcerated sex offenders. Despite its opposition to certain laws, the organization states that it "condemn[s] sexual abuse and all forms of coercion," and that it "does not engage in any activities that violate the law, nor . . . advocate that anyone else should do so."

On July 31, 2001, FBI Agent Robert Hamer joined NAMBLA by sending a letter and a money order to an address listed on the organization's Web site. Hamer joined NAMBLA using an alias and maintained his alias throughout his association with the group. He subsequently received a letter welcoming him to the organization and congratulating him on taking the "courageous step" of becoming a member. Agent Hamer later testified that he joined NAMBLA because he was involved in an investigation of a travel agency suspected of selling "sex tours" of Thailand, and he wanted to learn more about the "boy lover" mentality. He assumed the people going on these tours would be members of NAMBLA. In the course of his research, Agent Hamer read a report about Peter Melzer, a NAMBLA leader who had been terminated from his teaching position in New York City in 2000. *See Melzer*, 336 F.3d 185. Agent Hamer would later learn from another member that Melzer sometimes went by "Peter Herman," the name signed to his welcome letter. Agent Hamer was also aware of a civil wrongful death suit filed against NAMBLA and its leaders in federal court in Massachusetts. The claims against NAMBLA as an organization were later dismissed. *See Curley v. NAMBLA*, No. Civ.A. 00-10956-GAO, 2003 WL 21696547 (D. Mass. March 31, 2003).

Though the travel agency investigation concluded in October 2001 without any arrests, Agent Hamer remained an active member of the organization and would continue to renew his NAMBLA membership for the following three years. In 2001 and 2002, at the request of the organization, he sent holiday cards to incarcerated sex offenders. In 2002, he wrote two articles for the Bulletin in an attempt to impress

Melzer, though these articles were never published. He requested an invitation to NAMBLA's 2002 conference but was denied because he had not been a member for a long enough period of time.

The next year, Agent Hamer was invited to the November 2003 conference in New York. He suspected that both Melzer and Joseph Power, a member of NAMBLA's Steering Committee, would be in attendance. *See Curley*, 2003 WL 21696547 at *8. Power, according to the FBI's internal documents, was a registered sex offender and the subject of an active government investigation. The agent requesting authorization stated that Agent Hamer would attend the conference "to get information about known members of Nambla" and inquired as to whether there were other ongoing investigations of the organization or its members and heard back that there were none. Agent Hamer received permission to go undercover at the conference.

The conference itself was not held in public. Attendees were told to say they were with the "Wallace Hamilton Press" and to be discreet. The meeting was held in a commercial building separate from the hotel where attendees stayed and was not advertised as a NAMBLA event. Agent Hamer wore a recording device and collected information about the members in attendance, and this information was sent to other FBI offices as a lead on potential criminal activity. None of the leads proved fruitful because in most cases Agent Hamer could provide only first names.

After the conference, Agent Hamer published an article in the Bulletin and wrote a policy statement for NAMBLA's privacy committee, which he had joined. He also corresponded with Jeffrey Devore, a man who had admitted in conversation that he had had sex with a boy he met online. Agent Hamer suspected this man, Jeffrey Devore, would be present at the 2004 conference, to be held in Miami. The FBI supervisor

requested permission to send Agent Hamer to this conference and noted that:

> FBI-SD recently opened a case in an effort to determine the extent, if any, of NAMBLA's criminal activity. Intelligence gathered by UCE Hamer indicates that NAMBLA members actively arrange and participate in sexual molestation of children.

There were no specific subjects of investigation named. Agent Hamer received permission to attend and again wore recording equipment throughout the conference.

On the first evening of the conference, Agent Hamer met the defendant, David Mayer. During their casual conversation, Mayer said that he had been to Thailand several times and spoke about traveling to have sex with boys. Agent Hamer suggested that they form a travel group. Mayer responded with frustration that NAMBLA kept up pretenses of trying to change society when in fact its members only wanted to travel to meet boys.

The agent and the defendant corresponded, along with several other NAMBLA members, about traveling to Mexico to a hotel that could provide young boys for American tourists. Agent Hamer sent a link to a fake travel agency web site that had been constructed by the FBI prior to the 2004 conference, though Agent Hamer never mentioned it to anyone at the conference. Mayer made a reservation for the trip through the FBI's fake travel agency. Mayer and his co-defendants were promised "special friends" and asked about their "age preference." They sent either checks or credit card authorization to the FBI, which then bought the tickets and arranged the flights to San Diego. On February 11, 2005, Mayer flew with his two co-defendants to San Diego, where they were arrested.

On February 25, 2005, Mayer was indicted. The district court denied his motion to dismiss the indictment on March

8, 2006. Mayer pled guilty to one count under 18 U.S.C. § 2423(b) on May 25, 2006 and was sentenced on August 11, 2006 to 37 months in prison and 12 years of supervised release.

We review de novo a district court's denial of a motion to dismiss an indictment on constitutional grounds. *United States v. Bueno-Vargas*, 383 F.3d 1104, 1106 (9th Cir. 2004).

## II.   The First Amendment

**[1]** Dismissal of an indictment is appropriate "when a defendant has been granted immunity from prosecution, when his indictment is defective, or, usually, when the only evidence against him was seized in violation of the Fourth Amendment." *United States v. MacDonald*, 435 U.S. 850, 861 n.7 (1978). It is also proper when the defendant has been denied his Sixth Amendment right to a speedy trial, *see id.*, and potentially when the government has engaged in outrageous misconduct, *see United States v. Russell*, 411 U.S. 423, 432 (1973). Further, an indictment that results from selective prosecution will be dismissed. *See United States v. Wilson*, 639 F.2d 500, 503 (9th Cir. 1981). Of course, an indictment sought under a statute that is unconstitutional on its face or as applied will also be dismissed. *See United States v. Lopez*, 514 U.S. 549 (1995).

We have not found any cases where an indictment was dismissed because the preceding investigation allegedly violated the *First Amendment* rights of a third party. Rather, we have held that the *Fourth Amendment* provides the relevant benchmark. *See United States v. Rubio*, 727 F.2d 786, 791 (9th Cir. 1983). First Amendment concerns become part of the Fourth Amendment analysis because, under the Fourth Amendment, the court must "examine what is 'unreasonable' in the light of the values of freedom of expression." *Roaden v. Kentucky*, 413 U.S. 496, 504 (1973). Even if dismissal of the indictment were available on purely First Amendment grounds — and

our precedent suggests otherwise — Mayer has not alleged facts sufficient to suggest that the investigation actually violated any protected associational or expressive rights. *See United States v. Gering*, 716 F.2d 615, 620 (9th Cir. 1983).

## A.   Disclosure of Member Names

Mayer contends that, by disclosing information about NAMBLA members to FBI field offices, the government violated these members' rights to associational privacy under two Supreme Court cases.

In *N.A.A.C.P. v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), the Court held that the state could not compel the NAACP to disclose its list of members under the state corporations law. Applying the statute to the group, in the context of the mid-20th century South, would likely impose a substantial restraint on freedom of association because it would "expose[ ] these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462. Because disclosure in this particular case would have negative effects tending to discourage free association, the state's order would have to be justified by a compelling state interest. *Id.* at 463. It was not. *Id.* at 466. Contrary to Mayer's assertions, the Court did not hold that compelled disclosure in all cases is a per se constitutional violation.

The Court again acknowledged the potential harms of disclosure in the context of a legislative investigation in *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963). There, the Court held that the state had to prove that the investigation into the membership lists of the NAACP was likely to help identify "subversives" associated with the Communist Party. *Id.* at 548. The Court concluded that "an adequate foundation for inquiry must be laid before proceeding in such a manner as will substantially intrude upon and severely curtail or inhibit . . . protected associational rights."

*Id.* at 557. The state, failing to prove a "substantial connection" between its larger investigative goals and the specific investigation of the NAACP, lacked such a foundation. *Id.* Taken together, *N.A.A.C.P.* and *Gibson* hold that compelled disclosure of membership lists violates the Constitution only when the investigation would likely impose hardship on associational rights not justified by a compelling interest, or when the investigation lacks a substantial connection to a subject of overriding and compelling state interest. In *N.A.A.C.P*, the hardship was too severe; in *Gibson*, the connection too subtle.

[2] Here, the FBI discovered the identity of some NAMBLA members. Agent Hamer also obtained partial names and information for others and conveyed this information to FBI field offices to initiate investigations of individuals who took part in group activity where criminal conduct was openly discussed. Nevertheless, the FBI did not compel disclosure of any membership lists and the actions of the FBI in this case were far less intrusive than the disclosure of membership lists at issue in *N.A.A.C.P.* and *Gibson*. In this case, we do not believe that the FBI investigation likely imposed any significant hardships on the associational rights of NAMBLA members or lacked a substantial connection to a subject of overriding and compelling state interest.

## B.   Infiltration and Instigation

Mayer invites us to develop an "agent provocateur" rule that a government agent may not infiltrate a First Amendment-protected organization and provoke criminal conduct. We decline this invitation. First, any harm resulting from an agent's clandestine activity can be adequately remedied under the existing law. First Amendment violations may be remedied through a civil lawsuit. *See, e.g., Presbyterian Church v. United States*, 870 F.2d 518, 521-22 (9th Cir. 1989)(addressing First Amendment violations stemming from investigations of churches suspected of harboring illegal aliens); *Gibson v. United States*, 781 F.2d 1334, 1337 (9th

Cir. 1986)(holding that a claim under 42 U.S.C. § 1983, absent the statute of limitations, could have remedied an "unremitting campaign of terror and harassment" in which government agents stole documents and torched the plaintiffs' garage); *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 348-49 (6th Cir. 1984)(reversing the district court's grant of summary judgment to the government where its informant had infiltrated political party, misstated its goals in op-ed columns, stolen documents and run for office); *Handschu v. Special Servs. Div.*, 349 F. Supp. 766, 770 (S.D.N.Y. 1972) (reversing summary judgment where police officers had infiltrated antiwar groups and "create[d] an atmosphere . . . of mistrust, suspicion and hostility so as to prevent their free and lawful association with one another . . ."). Further, any harm caused by the instigation of crime is adequately covered by the Fifth Amendment's prohibition on outrageous governmental misconduct, a claim Mayer raises separately.

## C. Disruptions of NAMBLA Operations

**[3]** While the undercover agent was certainly not a passive member of NAMBLA — he participated in the privacy committee, published an article in the newsletter, and drafted a policy statement — Mayer fails to demonstrate that these activities actually interfered with NAMBLA's expressive or associational interests. Agent Hamer never took a leadership role and his writings do not misstate the organization's goals or undermine the organization's political messages, to the extent it sent any. *Cf. Ghandi*, 747 F.2d at 348-49.

**[4]** Mayer more persuasively points out that, as a result of the investigation and the arrests resulting from it, NAMBLA was unable to hold a conference in 2005. According to Peter Melzer's declaration, Agent Hamer had offered to host the conference, and NAMBLA was unable to reschedule it after he revealed his identity. Any violation here is more properly asserted by NAMBLA through a *Bivens* action, in which it could better develop any facts about the burden on its rights.

*See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). It seems unlikely that the organization would have problems scheduling a November weekend conference as a result of arrests occurring in February, and Agent Hamer's reports suggest that the conferences principally involved discussion of how to avoid detection by authorities rather than actual First Amendment-protected activity. With these doubts looming, a single statement in the record is simply too vague to ground the extreme remedy of a dismissal of an indictment.

## III.   The Fourth Amendment

We turn now to the question of whether, given the potential for interference with protected associational and expressive interests, the government's conduct remained within the bounds of the Fourth Amendment. Though this circuit's precedent clearly states that there is no requirement of probable cause when a law enforcement agency investigates an individual or group, Mayer asks us to adopt a reasonable suspicion standard for investigations that present a risk of interfering with an organization's First Amendment rights. We decline to do so because imposing such a requirement is unnecessary as a matter of law, and as a matter of applying existing law to these facts.

We last addressed this particular intersection of First and Fourth Amendment issues in *United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989). There, the district court denied a motion to suppress recordings of meetings at "sanctuary churches," which provided safe harbor to illegal aliens. We affirmed. The defendants in *Aguilar* had argued for a warrant requirement in investigations implicating the First Amendment. We rejected that argument in light of *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), a prior restraint case where the Supreme Court held that the risk of harm to expressive interests did not alter the Fourth Amendment analysis. Under *Zurcher*, the Fourth Amendment's warrant requirements

should simply be enforced with "scrupulous exactitude" when the government conducts a search or seizure of protected First Amendment materials. *See id.* at 564; *accord Aguilar*, 883 F.2d at 700. Without fashioning a new requirement of cause, *Aguilar* reiterated basic constitutional limits on undercover investigations, which we now examine and clarify here.

## A.   The Invited Informer Doctrine

**[5]** Undercover operations, in which the agent is a so-called "invited informer," are not "searches" under the Fourth Amendment. *Id.* at 701 (citing *Maryland v. Macon*, 472 U.S. 463 (1985)). Even though a conversation between an agent and a target may occur in an otherwise private environment, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 698 (quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)). Finding an expectation of privacy in the defendants' surreptitiously recorded comments would have been, we observed, "inimical to established fourth amendment doctrine." *Id.* at 699.

The First Amendment was of limited help to the defendants in *Aguilar* because we held that it did not expand the scope of the defendants' legitimate expectation of privacy. In *Gering*, which we found analogous, this court held that the FBI could constitutionally impose a "mail cover" on a minister suspected of mail fraud. 716 F.2d at 620. Because a person has no legitimate expectation of privacy in the outside of his mail under the Fourth Amendment, *see United States v. Choate*, 576 F.2d 165, 175 (9th Cir. 1978), and because the minister had not shown any other burden on his First Amendment rights, we found no constitutional violation. *Gering*, 716 F.2d at 620, *cited with approval in Aguilar*, 883 F.2d at 701-02. The First Amendment did not create a legitimate expectation of privacy going beyond that afforded by the Fourth Amendment.

**[6]** The speculative threat to First Amendment rights, absent some showing of an actual First Amendment violation, did not create a carve-out to the invited informer doctrine in *Aguilar*. While we recognized that the rationale behind the invited informer cases "inherently imposes a rather significant burden on first amendment free association rights," we nevertheless concluded that, "[i]n approving this investigative technique, the Supreme Court unmistakably declared that persons have no expectation of privacy or confidentiality in their conversations and relations with other persons, no matter how secretive the setting." *Aguilar*, 883 F.2d at 703.

Because no probable cause was required under the invited informer doctrine, the government's undercover investigation in *Aguilar* would be evaluated in light of only two general principles: "First, the government's investigation must be conducted in good faith; i.e., not for the purpose of abridging first amendment freedoms. . . . Second, the first amendment requires that the undercover informers adhere scrupulously to the scope of a defendant's invitation to participate in the organization." *Id.* at 705 (citations omitted). By mentioning these two considerations, *Aguilar* draws out relevant principles from existing doctrine.

## B.　Good Faith

**[7]** Good faith has been an implicit requirement for investigations under the Fifth Amendment and searches under the Fourth Amendment. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 707 (1972); *Younger v. Harris*, 401 U.S. 37, 53-54 (1971); *Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1061 (D.C. Cir. 1978), *cited with approval in Aguilar*, 883 F.2d at 705. *Aguilar* defines, with an "i.e.," that good faith means the investigation must not be "for the purpose of abridging first amendment freedoms."*Aguilar*, 883 F.2d at 705. There was no such intention in this case, though we believe it is worth clarifying this requirement.

Mayer asks us to establish a reasonable suspicion requirement, separate from good faith, for investigations of organizations that are protected by the First Amendment.[1] While this circuit has clearly established that investigations of individuals require no reasonable suspicion under the Fifth Amendment, *see United States v. Luttrell*, 923 F.2d 764, 764 (9th Cir. 1991), Mayer contends that the First Amendment requires such a result when the police engage in surveillance of protected associational activities of a group. He points to language in *Gibson* stating that state investigations of First Amendment-protected organizations must be based on an "adequate foundation." *See Gibson*, 372 U.S. at 551.

The adequate foundation required by that case, however, is part of the state interest prong of the First Amendment analysis: The state demonstrates an "adequate foundation" when there is a nexus between the state's investigation and the interest it allegedly serves. *Id.* The Court summarized its holding as follows: "[W]e hold simply that groups which themselves are neither engaged in subversive or other illegal or improper activities nor demonstrated to have any substantial connection with such activities are to be protected in their rights of free and private association." *Id.* at 557-58. There is no reason to fashion a formalistic reasonable suspicion requirement out of the refrain of a basic First Amendment standard.

*Gibson*, however, involved a legislative investigation and does not provide the appropriate standard here, though its principles may be useful. When evaluating executive branch investigations that threaten First Amendment rights, this court and others have required that the investigation serve a legitimate law enforcement interest. While the explicit language of

---

[1]*Aguilar* does not address whether reasonable suspicion might be required because that question was not before the court, and it was clear in that case that the government had reasonable suspicion. *See Aguilar*, 883 F.2d at 696 n.36.

*Aguilar*'s "good faith" requirement appears narrower (limited to an intent not to violate First Amendment rights), we read it as drawing from a more general concept of good faith. The cases cited in *Aguilar* suggest that, to avoid running afoul of the First Amendment, the government must not investigate for the purpose of violating First Amendment rights, and must also have a legitimate law enforcement purpose. Alternatively, the government can satisfy its burden by showing that its interests in pursuing legitimate law enforcement obligations outweigh any harm to First Amendment interests. *See, e.g.*, *Branzburg v. Hayes,* 408 U.S. at 707; *Reporters Comm.*, 593 F.2d at 1061 (D.C. Cir. 1978); *cf. Branzburg*, 408 U.S. at 710 (Powell, J., concurring) (emphasizing the "legitimate need of law enforcement").

In the specific context of infiltration, courts have continued to require a legitimate law enforcement purpose.[2] In the first case directly addressing this issue, the district court for the Southern District of New York denied the city's motion to dismiss a complaint alleging that undercover police had improperly infiltrated antiwar groups. The court found that the alleged conduct of the undercover officers — creating internal dissent within the groups by suggesting criminal conduct and providing funds and equipment to further that purpose — would not have been justified by any law enforcement need. *See Handschu*, 349 F. Supp. at 770. The district court recently held, in the continuing *Handschu* litigation, that routine police videotaping of public gatherings lacked a legitimate law enforcement purpose, in violation of guidelines fashioned after the 1972 case. *See Handschu v. Special Servs. Div.*, 475 F. Supp.2d 331, 351-52 (S.D.N.Y. 2007).

---

[2]*Aguilar* itself seems to embrace this language. In dicta we said that, even in private settings, "*legitimate law enforcement interests* require persons to take the risk that those with whom they associate may be government agents." *Aguilar*, 883 F.2d at 703 (emphasis added).

**[8]** In similar litigation, the Seventh Circuit has reiterated that investigations of First Amendment-protected organizations must have a proper law enforcement purpose. Over the course of twenty years, the court of appeals interpreted a 1981 consent decree binding city and federal government investigations of groups claiming First Amendment protections. Specifically, the consent decree prohibited the FBI from conducting any investigation "solely on the basis of activities protected by the First Amendment." *See Alliance To End Repression v. City of Chi.*, 91 F.R.D. 182 (N.D. Ill.1981). The court of appeals, however, refused to enjoin the application of FBI guidelines allowing investigations on the basis of statements advocating criminal activity. *See Alliance To End Repression v. City of Chi.*, 742 F.2d 1007, 1010 (7th Cir. 1984) (en banc). With "proto-terrorist" groups in mind, the court observed that infiltration of even a First Amendment-protected organization could be justified by a "genuine concern for law enforcement." *See id.* at 1015. Because investigations are less intrusive than prosecutions, the court explained, "a less immediate danger will justify the government's action. *Id.* at 1016 (citing *Handschu*).

Twenty years later, the court of appeals modified the consent decree to loosen restrictions on investigations conducted by the City of Chicago, which was also a party to the agreement. *See Alliance To End Repression v. City of Chi.*, 237 F.3d 799 (7th Cir. 2001). In doing so, the court of appeals again observed that the First Amendment permits undercover surveillance "unless the motives of the police are improper or the methods forbidden by the Fourth Amendment or other provisions of federal or state law." *Id.* at 802. Though they reach different results, the *Alliance* and *Handschu* actions both consider whether investigations have a legitimate law enforcement (purpose, and the extent to which they impinge on First Amendment freedoms.

**[9]** We agree and clarify that good faith, under *Aguilar*, requires that an investigation threatening First Amendment

rights, like any government investigation, be justified by a legitimate law enforcement purpose that outweighs any harm to First Amendment interests. This undercover investigation was so justified, and was not carried out for the purpose of abridging First Amendment freedoms. There was nothing improper about Agent Hamer's joining the group initially to do research for another investigation into sex tourism. Between that time and the start of his surveillance activity related to this case, he received the names and addresses of convicted sex offenders, and child sex offenders, through the holiday card program. There was a wrongful death suit filed in another state against NAMBLA leaders based on the actions of an alleged NAMBLA member who had abducted and killed a child. Agent Hamer had reason to believe a former convicted sex offender, named in that suit and allegedly serving on the steering committee, would be at the 2003 conference. At that conference, members openly discussed past and future criminal conduct, as well as how to avoid detection. There was clearly a legitimate law enforcement purpose justifying the undercover investigation at the 2003 and 2004 NAMBLA conferences, and there is no evidence that the government undertook its investigation in order to abridge First Amendment freedoms. Here, its interests in pursuing legitimate law enforcement objectives outweighed any harm to First Amendment interests. Therefore, the government's infiltration of NAMBLA was not unlawful.

## C.   Scope of the Invitation

The "scope of the invitation" language in *Aguilar*'s second requirement is derived from *Pleasant v. Lovell*, 876 F.2d 787 (10th Cir. 1989), a Fourth Amendment decision. *Pleasant* involved an FBI informant who was employed as the secretary of a known tax protest organization and had removed documents she encountered in the course of her employment. Though the organization was exercising protected speech and associational rights, the First Amendment required only that the Fourth Amendment's requirements be applied with "scru-

pulous exactitude." *Id.* at 803 (quoting *Zurcher*, 436 U.S. at 564). Accordingly, operating without a warrant, the informant was entitled to review and remove those documents to which the organization had knowingly given her access. *Id.* at 802. In other words, if the organization had no legitimate expectation of privacy in those documents, there would be no Fourth Amendment claim.

**[10]** *Aguilar* imports this language, and we read it as importing this reasoning as well: the "scope of the invitation" is coterminous with the organization's legitimate expectation of privacy. Just as *Zurcher* held that the government must follow warrant procedures with "scrupulous exactitude" in sensitive cases, *Aguilar* holds, with similar language, that the government must "scrupulously adhere" to the scope of invitation and seek a warrant whenever its investigative activities would constitute a search under the Fourth Amendment and potentially threaten protected associational interests. This reading of the law is consistent with *Aguilar*'s overall conclusion that the First Amendment does not expand the criminal procedural protections provided by the Fourth Amendment.

**[11]** Here, NAMBLA invited Agent Hamer to join its group, participate in its holiday card program, attend its conferences, and participate in the privacy committee. He received access to other people, not access to files or information. In essence, NAMBLA invited Agent Hamer to join its social network; his conversations with other members were well within the scope of that invitation, and NAMBLA had no legitimate expectation of privacy in them.

**[12]** In summary, *Aguilar* articulates a Fifth Amendment requirement of good faith and a Fourth Amendment warrant requirement. Neither requirement becomes more stringent in light of the threat to First Amendment values. Rather, the risk of a First Amendment violation is part of the analysis courts apply under the Fourth and Fifth Amendments. We hold that this investigation fell within these bounds.

### IV.   Outrageous Governmental Misconduct

**[13]** The Fifth Amendment requires dismissal of an indictment for governmental misconduct "only where the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Citro*, 842 F.2d 1149, 1152 (9th Cir. 1988) (internal quotation marks omitted). Mayer's seven claims of outrageous misconduct boil down to three principal arguments: The government engineered the criminal enterprise that generated the arrests, the government manufactured federal jurisdiction, and the FBI agent used inappropriate, sexually explicit language and promises to entice Mayer to commit a crime.

### A.   Criminal Enterprise

We have only once dismissed an indictment because the government directed a criminal enterprise. In *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), the government supplied the equipment and raw material for a bootlegging operation and was the defendant's sole customer; *see also United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). Since *Greene*, this court has rejected similar charges of misconduct where the government supplied counterfeit credit cards to detect which merchants would accept them. *See Citro*, 842 F.2d at 1153. In a case where an FBI agent bribed a state senator, we found no misconduct. *See United States v. Carpenter*, 961 F.2d 824, 829 (9th Cir. 1992). Most recently, we declined to dismiss an indictment where the government established fake bank accounts and wired money to Mexican banks suspected of money laundering. *See United States v. Gurolla*, 333 F.3d 944, 948-49 (9th Cir. 2003). We noted that the outrageous misconduct claim is limited to "extreme cases," *id.* at 950, for example those characterized by "dominant fomentation" or "aggressive solicitation" of criminal activity. *United States v. Bagnariol*, 665 F.2d 877, 883 (9th Cir. 1981).

**[14]** Here, the FBI did not actually create a criminal enterprise. It constructed a fake travel agency Web site, and Agent

Hamer lied about the arrangements he had made for the group. Like the agent who bribed the legislator in *Carpenter*, Agent Hamer engaged in fictional criminal conduct and lied about being able to facilitate access for Mayer. *See also United States v. Williams*, 791 F.2d 1383, 1386 (9th Cir. 1986) (refusing to dismiss indictment where prison authorities may have encouraged but did not actually aid jailbreak attempt). Moreover, the agent did not pay for Mayer's trip, coerce him into buying a ticket, or plant the idea of traveling for illicit sexual conduct in Mayer's mind. While Mayer points out there was no ongoing criminal enterprise that the government was merely trying to join, *see Gurolla*, 333 F.3d. at 950, Mayer was certainly a willing and experienced participant in similar activities.

## B.   Federal Jurisdiction

**[15]** The bar for proving manufactured federal jurisdiction is similarly high. In the benchmark case *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), the court of appeals dismissed the indictment where a federal agent made a single phone call from New Jersey to New York in order to generate federal jurisdiction. The court found that jurisdiction had been "manufactured by the Government for the precise purpose of transforming a local . . . offense into a federal crime." *Id.* at 681; *see also United States v. Coates*, 949 F.2d 104, 106 (4th Cir. 1991) (dismissing indictment where the interstate element was contrived by the government for the sole purpose of creating federal jurisdiction). Here, traveling to another country, where access to young boys would be easier, was part of the plan from inception to execution. Interstate travel was an integral part of the crime itself, and not contrived simply to guarantee federal jurisdiction.

## C.   Improper Relationship

**[16]** An agent's relationship with a defendant before the arrest constitutes misconduct only if it implies some degree of

coercion and impropriety the case law prohibits. *See Sherman v. United States*, 356 U.S. 369, 376 (1958). Use of sex as an enticement is not per se coercive. *See United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987). The terms of endearment in Agent Hamer's e-mails seemed to be a common language in this community, and the agent simply offered a vacation that appealed to the defendant. There is no evidence in the record that any coercive relationship existed between Mayer and Hamer.

## V.   Conclusion

Mayer has raised several important questions that require us to clarify the existing law of surveillance. We have done so and conclude that the investigation here was within the bounds established by our cases. Because we decline to hold that any conduct here violated the defendant's constitutional rights, the district court's denial of the motion to dismiss the indictment is

AFFIRMED.